UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

===============================================================

ELLA ABADIR,

                Plaintiff,

    v.                                        **DECISION AND ORDER**

                                              14CV855S

CENTER ONE, LLC,

                Defendant.

===============================================================

### Table of Contents

I.    INTRODUCTION ................................................................................................. 2

II.   BACKGROUND .................................................................................................. 4

   A.  An Introduction to Defendant's Staff ............................................................ 4

   B.  Pleadings ..................................................................................................... 6

   C.  Defendant's Motion for Summary Judgment (Docket No. 30) ...................... 9

       1.   Factual Assertions .............................................................................. 9

       2.   Defendant's Arguments for Summary Judgment ................................ 16

       3.   Plaintiff's Response ........................................................................... 18

   D.  Defendant's Motion for Sanctions (Docket No. 30) .................................... 20

       1.   Defendant's Contentions .................................................................. 20

       2.   Plaintiff's Response ........................................................................... 21

   E.  Plaintiff's Motion for Adverse Inference (Docket No. 52) ........................... 22

   F.  Defendant's Motion to Strike Yolanda Jones Affidavit (Docket No. 56) ......... 23

III.  DISCUSSION ................................................................................................... 25

   A.  Applicable Standards ................................................................................ 25

       1.   Summary Judgment .......................................................................... 25

       2.   Age and Disability Discrimination ...................................................... 28

       3.   Hostile Work Environment ................................................................. 29

       4.   Retaliation ......................................................................................... 30

       5.   Motions for Adverse Inference, Striking the Affidavit, and Discovery Sanctions ...................... 31

B.   Motions Preliminary to Summary Judgment Motion; Plaintiff's Motion for Adverse Inference (Docket No. 52) and Defendant's Motion to Strike (Docket No. 56) ........................................................ 34

    1.   Plaintiff's Motion for Adverse Inference (No. 52) .......................................................... 34

    2.   Defendant's Motion to Strike Yolanda Jones' Affidavit (No. 56) ................................. 36

C.   Defendant's Motion for Summary Judgment (Docket No. 30) ........................................... 38

    1.   Timeliness of Age Discrimination Claim ...................................................................... 38

    2.   Other Elements of Age Discrimination Claim ............................................................... 41

    3.   Allegations of Disability Claim ..................................................................................... 47

    4.   Allegations of Hostile Work Environment .................................................................... 47

    5.   Allegations of Retaliation ............................................................................................. 48

    6.   Defendant's Motion for Sanction for Alteration of Evidence (Docket No. 30) ........... 51

D.   What Remains—Supplemental Jurisdiction ....................................................................... 54

IV.   CONCLUSION .............................................................................................................................. 54

V.   ORDERS ....................................................................................................................................... 55

## I.   INTRODUCTION

Before this Court are a series of motions starting with Defendant's Motion for Summary Judgment and for Sanctions (Docket No. 30), arguing that Plaintiff's age discrimination claim is time barred; Plaintiff failed to allege her disability claim; and there was no actionable hostile work environment or retaliation claims (id.).   Defendant also seeks sanctions for alleged witness tampering (Docket No. 32, Def. Memo. at 32-35).   In support of its motions, Defendant submitted its Statement of Facts (Docket No. 31); Memorandum of Law (Docket Nos. 32, 33 (with exhibits)); defense counsel's Affirmation with exhibits (Docket No. 38); and the affidavits of Defendant's employees or employees of affiliate corporation, Capital Management Services (Docket Nos. 34-36[1]).

---

[1]Affidavit of Julie Fulcinti, executive vice president of Capital Management Services, Docket No. 34 (with exhibit); Affidavit of Holly Donohue, former official at Defendant, Docket No. 35 (with exhibits); and

Responses to Defendant's Motion for Summary Judgment were due by May 12, 2017, and replies by May 26, 2017 (Docket No. 37).  Plaintiff filed her timely response (Docket Nos. 41-51, 53[2]), including Yolanda Jones' affidavit in opposition to the summary judgment motion (Docket No. 40).  Defendant replied (Docket Nos. 54, 55 (attorney's affirmation with exhibit, portion of deposition transcript).

During the briefing of that motion, Plaintiff moved for an adverse inference because Defendant did not preserve audio and video recordings and documents of subordinates' alleged complaints against Plaintiff (Docket No. 52).  Defendant later moved to strike Yolanda Jones' affidavit (see Docket No. 40) because she was not disclosed as a witness for Plaintiff (Docket No. 56).  This Court, however, did not schedule briefing for Plaintiff's motion for an adverse inference (Docket No. 52) or Defendant's motion to strike (Docket No. 56; see Docket Nos. 57, 58 (attorney's affirmation with exhibit, copy of Jones's affidavit)).  Nevertheless, the parties filed responding (Docket Nos. 59, 60 (opposing motion for adverse inference), 62 (opposing striking)) and replying papers (Docket Nos. 61 (reply for motion for adverse inference), 63, 64, 66 (reply for motion to strike)).  Thus, all motions were fully briefed, and the matter submitted.

After addressing first the subsidiary motions to the Motion for Summary Judgment and for the reasons stated herein, Plaintiff's Motion (Docket No. 52) for an adverse inference is **denied or deemed moot** and Defendant's Motion (Docket No. 56) to strike

_____

Affidavit of Patti Sue O'Malley, director at Defendant and vice president at Capital Management Services, Docket No. 36 (with exhibits).

[2]In addition to Ms. Jones' Affidavit, Plaintiff submits in opposition her Affidavit, Docket No. 43; the Affidavits of former Defendant employees Shaina Hibbard, Docket No. 41, and Jason Minchen, Docket No. 42; and the Affidavit of her counsel, Docket No. 49; and her exhibits, Docket Nos. 45-47, 51, 53.  She also submitted her Counterstatement of Facts, Docket No. 44 ("Pl. Response"), and Memorandum of Law, Docket No. 48.

Ms. Jones' affidavit (Docket No. 40) is also **denied**.  Upon these decisions and the moving papers for and against Defendant's Motion for Summary Judgment (Docket No. 30), and given Plaintiff's withdrawal of her Third Cause of Action for disability discrimination (Docket No. 48, Pl. Memo. at 4), Defendant's Motion for Summary Judgment (Docket No. 30) for that claim is **granted**.  As for Plaintiff's age discrimination claim, Defendant's Motion for Summary Judgment (id.) is **granted**; on Plaintiff's retaliation claim, Defendant's Motion (id.) is also **granted**; and as for her hostile work environment claim, Defendant's Motion (id.) is **granted**.  Finally, Defendant's Motion for Sanctions (id.) is **denied**.

## II.    BACKGROUND

A.  An Introduction to Defendant's Staff

To understand the allegations raised in the three pending motions, introductions are in order.  Plaintiff's brother, Dan Abadir, was a co-owner of Defendant when Plaintiff was hired (Docket No. 31, Def. Rule 56.1 Statement of Undisputed Material Facts ¶ 2 ("Def. Rule 56.1 Statement")).  Dan Abadir requested Plaintiff come to Defendant to help "grow" the company (Docket No. 43, Pl. Aff. ¶¶ 2, 6; Docket No. 44, Pl. Response ¶ 9).  Plaintiff started as a manager assigned to Defendant's First Niagara Bank account and later, as detailed below, a business analyst (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 5, 40).  She worked as a department manager at Defendant from February 2010 (Docket No. 1, Compl. ¶ 8).  Plaintiff later stated that she was 48½ years old when hired (Docket No. 43, Pl. Aff. ¶ 12; see id. ¶ 154 (Plaintiff turned 50 in July 2011)).  Plaintiff thus was one of the older employees with Defendant (see id. ¶ 13).

Holly Donohue was the director of operations and later vice president of operations at Defendant during Plaintiff's tenure, and she was Plaintiff's immediate supervisor

(Docket No. 35, Holly Donohue Aff. ¶¶ 1, 3, 4; Docket No. 43, Pl. Aff. ¶¶ 17, 20; Docket No. 31, Def. Rule 56.1 Statement ¶ 6).  Patti Sue O'Malley was vice president of client and employee operations (until March 2012, then worked at affiliated Capital Management Services, LP in a similar capacity) where she oversaw Defendant's human resources department and call monitoring areas (Docket No. 36, Patti Sue O'Malley Aff. ¶¶ 1, 4).  Betty Lane was the director of human resources at Defendant (Docket No. 43, Pl. Aff. ¶ 133).  Julie Fulcinti was executive vice president and later chief administrative officer of Capital Management Services, with duties that included overseeing Defendant's human resources department (Docket No. 34, Julie Fulcinti Aff. ¶¶ 1, 3).  Jason Minchen was a department manager with Defendant, splitting management of staff on the First Niagara Bank account with Plaintiff when she started (Docket No. 42, Jason Minchen Aff. ¶¶ 1, 5-6).  Shania Hibbard was a customer service representative at Defendant from August 2008 to December 2012 and was supervised by Plaintiff from when Plaintiff started until December 2012 (Docket No. 41, Shania Hibbard Aff. ¶¶ 1-2).  Yolanda Jones was another employee supervised by Plaintiff who was promoted to temporary senior representative, permanent senior representative, and supervisor until she left Defendant in 2016 (Docket No. 40, Yolanda Jones Aff. ¶¶ 1-2, 4).  Defendant seeks to strike this affidavit (Docket No. 56).

Plaintiff named other, younger employees in this action who did not testify in this action.  Jennifer Michael was a director, a position higher than a manager in Defendant's organization (Docket No. 43, Pl. Aff. ¶ 32; see Docket No. 1, Compl. ¶¶ 16, 17).  Mark Jones was a manager (Docket No. 41, Hibbard Aff. ¶ 22) with Lou Vertino, Minchen, and Plaintiff (id.).  Sally Senft was an executive assistant at Capital Management Services

5

(Docket No. 1, Compl. ¶ 14, Ex. 1); Plaintiff later stated that Senft was assistant to the vice president of operations at Capital Management Services (Docket No. 43, Pl. Aff. ¶ 108).  Plaintiff also referenced Melanie LeRoy, who worked as help desk manager in Defendant's IT department (id. ¶ 345), who Plaintiff claims received more favorable treatment than Plaintiff (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 108-09; Docket No. 1, Compl. ¶ 42).  Cara Robinson is Defendant's vice president for information technology (Docket No. 59, Def. Memo. at 2; Docket No. 60, see Def. Atty. Decl. ¶ 9, Ex. A).

B. Pleadings

Plaintiff alleges that this is a Title VII, 42 U.S.C. §§ 2000e, et seq., Age Discrimination in Employment Act, 29 U.S.C. §§ 621, et seq. ("ADEA"), and Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq., action alleging age and disability discrimination, hostile work environment, and retaliation (Docket No. 1, Compl.).  The Complaint, however, does not allege a Title VII claim (cf. id. ¶ 1 ).  She alleges age and disability discrimination with respect to her workload and discipline and Plaintiff later argues that Defendant denied her request to return to work after her doctor released her from medical leave (id. ¶ 10).  She also alleges she complained of her disparate treatment and was retaliated against for complaining (id. ¶ 11).

For her age discrimination claim, Plaintiff alleges that younger employees were not responsible for as many projects as she was (id. ¶ 13), such that she had to work sixteen hours a week more than a forty-hour workweek (id. ¶¶ 15, 16).  Plaintiff was responsible for a larger staff than younger managers (id. ¶¶ 19-20) but when her staff was doubled to work on the First Niagara Bank account, Plaintiff received an untrained supervisory staff

(id. ¶ 20).  She complains that younger employees were treated more favorably when disciplined than she was (id. ¶¶ 21-23).  She also did not have the same level of access to software programs or general assistance from Holly Donohue (id. ¶¶ 24-26, 8).  Plaintiff claims that Ms. Donohue kept Plaintiff under greater scrutiny than younger managers, keeping track of the time Plaintiff took to complete tasks despite mandatory meetings Plaintiff had to attend (id. ¶ 18).  Ms. Donohue and Patti Sue O'Malley allegedly disclosed Plaintiff's age on the day after her fiftieth birthday (id. ¶ 27).  Plaintiff later complained in March 2013 about this "abusive behavior" to no avail (id. ¶ 28).  She contends that she was then subjected to retaliation following these complaints (id. ¶ 29), claiming that she was denied a raise given to other managers in retaliation (id. ¶¶ 30-31).

Plaintiff gave examples by name of younger managers who received preferential treatment while she did not.  For example. she points to Sally Senft, an employee in a similar position in Defendant's sibling corporation, Capital Management Services, who worked fewer hours than Plaintiff did and had fewer responsibilities but was paid more than Plaintiff (id. ¶ 14, Ex. 1 (Equal Employment Opportunity Commission, "EEOC," charge of discrimination)).  A younger manager, Jennifer Michael, worked fewer hours than Plaintiff, allowed to leave work at 2 pm each afternoon, while Plaintiff worked to 10 pm and sometimes to 2 am (id. ¶¶ 17, 16).  Another younger manager, Mark Jones, had complaints about him without any sanction, while Plaintiff was reprimanded for being three minutes late (the same amount of time Mr. Jones was without penalty) (id. ¶¶ 22-23, Ex. 1).

On or about May 21, 2013, following another complaint to human resources, O'Malley "forcibly removed Plaintiff's cellphone from her hand" and Plaintiff was accused

of having personal information on work equipment (id. ¶ 32).  Plaintiff developed a medical and mental conditions caused by stress brought on by harassment and hostile work environment at Defendant (id. ¶ 34).  On or about May 22, 2013 (after the cellphone incident), Plaintiff went to the doctor because she felt ill minutes after that incident; she was diagnosed with a mild heart attack (id. ¶ 35).  Plaintiff went on medical leave on May 23, 2013.  Plaintiff was cleared by her doctor to return to work on September 4, 2013. (Id. ¶¶ 36-37.)  Defendant, however, did not allow Plaintiff to return to work (id. ¶ 37).  On September 9, 2013, Plaintiff's doctor wrote to Defendant clearing Plaintiff to work for forty hours a week (id. ¶ 39).  Defendant told Plaintiff that she could not return to her former position but could come back as a collector, a stressful position that would be a demotion (id. ¶ 40).  Plaintiff contends that this offer was in retaliation (id.).  On October 10, 2013, her doctor again wrote that Plaintiff could not work as a collector due to the constant stress and unpredictability of the job (id. ¶ 41).  Plaintiff contrasts this with a younger employee, Melanie LeRoy, who was allowed to return to Defendant with accommodations to her hours for her unspecified condition (id. ¶ 42).

The First Cause of Action alleges age discrimination and retaliation in violation of the ADEA (id. ¶¶ 44-47).  Plaintiff, however, never expressly alleges her age here (cf. id. ¶¶ 27 (noting her 50th birthday, without stating year), 49 (alleging that she is over eighteen years old), Ex. 1, EEOC charge of discrimination at 2; see also Docket No. 43, Pl. Aff. ¶¶ 12 (48½ years old when hired), 154 (turned 50 in July 2011)) or the ages of the employees she is using as comparatives (see also Docket No. 43, Pl. Aff. ¶¶ 13-14, Ex. A (list of management employees with years of birth indicated), 18 (believing that Holly Donohue was in her late 30s).  The Second Cause of Action alleges age and disability

8

discrimination and retaliation under the New York Human Rights Law, N.Y. Exec. L. § 396 (Docket No. 1, Compl. ¶¶ 49-53; see id. ¶ 3 (supplemental jurisdiction under 28 U.S.C. § 1367)).  The Third Cause of Action claims disability discrimination and retaliation in violation of the Americans with Disabilities Act (id. ¶¶ 55-58).  Plaintiff seeks a declaration that Defendant's actions violated law, a permanent injunction to cease and desist from engaging in illicit and unlawful acts, award her wages, benefits lost due to the discrimination, compensatory, liquidated, and punitive damages and costs (id., WHEREFORE Cl. at pages 8-9).

Defendant answered (Docket No. 5).

## C.  Defendant's Motion for Summary Judgment (Docket No. 30)

### 1.  Factual Assertions

According to Defendant's Statement (where not controverted by Plaintiff, cf. Docket No. 44, Pl. Response to Def. Rule 56.1 Statement, "Pl. Response"), Plaintiff was hired by Defendant in February 2010 after her brother Dan offered her a position (Docket No. 31, Def. Rule 56.1 Statement ¶ 1).  Plaintiff was immediately placed in a department management role and was paid the highest salary of managers working for Defendant (id. ¶ 5).  Plaintiff reported to Donohue who, in turn, reported to Dan Abadir and the other owners of Defendant (id. ¶ 6).  Defendant claims that Plaintiff was made co-manager of Defendant's account with First Niagara Bank (id. ¶ 9); Plaintiff disputes this, contending that she was hired to grow the company and was placed in a managerial position to become familiar with its business (Docket No 44, Pl. Response to Def. Rule 56.1 Statement ¶ 9).  The primary responsibility of Defendant's First Niagara Bank department was to handle inbound customer service calls from Bank account holders (Docket No. 31,

Def. Rule 56.1 Statement ¶ 10).  Plaintiff oversaw the night shift while Jason Minchen worked the day shift (id. ¶ 11).  Their jobs were similar (id. ¶¶ 12-13), although Plaintiff detailed additional duties that Defendant termed (id. ¶ 13) part of her "routine" supervisory functions (Docket No. 44, Pl. Response ¶ 13).

During Plaintiff's tenure with Defendant, she raised several issues or became embroiled in disputes with her supervisor, Donohue.  First, Plaintiff consistently was tardy in reporting for work (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 66-69).  Later, Plaintiff complained to Fulcinti that Donohue criticized Plaintiff for the time it took Plaintiff to finish a spreadsheet (id. ¶ 72), that she was late preparing a report (id. ¶ 73), and that Donohue was tracking the time Plaintiff took to complete projects (notwithstanding Plaintiff's obligation to attend compulsory office meetings) (id. ¶ 80).  Plaintiff, however, never complained that she was treated differently than other managers or employees because of her age (id. ¶¶ 78, 79).  Plaintiff disputes this, arguing that Defendant's notes from her conferences with Fulcinti were incomplete and stating that she told Fulcinti that Donohue undermined Plaintiff's authority with her staff; that Donohue tolerated major breaches in company policy and inappropriate conduct by younger managers; that Donohue held Plaintiff to strict deadlines on projects while allowing younger managers to miss deadlines; and Donohue did not provide sufficient assistance for the First Niagara Bank conversion while younger managers were supported by a staff ratio of 1 manager to 15 employees (Docket No. 43, Pl. Aff. ¶ 210; see Docket No. 44, Pl. Response ¶¶ 78-79).

Defendant claims that Plaintiff was known to fall asleep at her desk or surf the Internet at work (Docket No. 31, Def. Rule 56.1 Statement ¶ 85).  Plaintiff denies this (Docket No. 44, Pl. Response ¶ 85; Docket No. 43, Pl. Aff. ¶¶ 216-17, 223, 224; Docket

No. 40, Jones Aff. ¶¶ 29-30; Docket No. 42, Minchen Aff. ¶¶ 47-48, 51), asserting that she was reported to have fallen asleep once at work and it was due to a medical condition (Docket No. 43, Pl. Aff. ¶¶ 218-20).  She also argues that Defendant failed to preserve evidence of either sleeping or Internet usage (such as security surveillance recordings within the office) or produce it in its discovery, hence her motion for an adverse inference (id. ¶¶ 221-22, 225-26; see Docket No. 52).

Around April 2012, the First Niagara Bank department received an increase in call volume as First Niagara Bank acquired other banks whose accounts were converted to First Niagara Bank (Docket No. 31, Def. Rule 56.1 Statement ¶ 16).  Defendant addressed this by hiring more workers (id. ¶¶ 17, 18), although Plaintiff faults Defendant for not hiring supervisors or senior customer service representatives (Docket No. 44, Pl. Response ¶ 17).  Plaintiff also complained that she and her staff were deprived access to computer programs (Docket No. 1, Compl. ¶¶ 24-25).  Defendant contends that the First Niagara Bank department was unique because the Bank furnished the computer equipment (Docket No. 31, Def. Rule 56.1 Statement ¶ 29.)  Plaintiff counters that the Bank did place its server in Defendant's office, but Defendant's agents were assigned computers furnished by Defendant.  Defendant also had a disposition program that tracked customer queries.  (Docket No. 44, Pl. Response ¶ 29).  Plaintiff implies (but does not allege) that she had extra work addressing questions from her staff not equipped with appropriate software.

Plaintiff cites to Yolanda Jones' affidavit for supporting her contention that Defendant did not hire supervisors or senior customer service representatives (id. ¶¶ 17, 19; Docket No. 40, Jones Aff. ¶¶ 5-8).  Jones states that 200 employees were working on

the First National Bank conversion, many of whom were temporary employees and Jones worked as a temporary senior representative (or team lead) (Docket No. 40, Jones Aff. ¶¶ 5-6).  Jones also states that customer service representatives and team leads "were not given access to email or a program called Symposium" when she was a temporary senior representative, although that staff needed access to Symposium and email (id. ¶ 7).  "Without access to email and Symposium at our desks," Jones claims, "Customer Service Representatives and Team Leads needed to either refer a call to a Supervisor or Manager, or to move to a different desk where Symposium or email was available on the computer" (id. ¶ 8).  Plaintiff next disputes Defendant's allegation (Docket No. 31, Def. Rule 56.1 Statement ¶ 20) that Jason Minchen and other department managers backed her up (Docket No. 44, Pl. Response ¶ 20, citing Docket No. 40, Jones Aff. ¶ 12).  There, Jones states that she did not recall seeing managers other than Plaintiff regularly working on the First National Bank project (Docket No. 40, Jones Aff. ¶ 12).  First Niagara Bank employees working on Defendant's premises did not assist Defendant's managers (id. ¶ 14).  Jones, as a senior representative and a supervisor, knew functions that a senior representative could not perform and were not performed by Team Leads during the conversion (id. ¶ 15).

Next, Donohue accused Plaintiff of not working well with other employees and not communicating effectively with them or with Donohue (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 43-59; Docket No. 35, Donohue Aff. ¶ 24).  Donohue heard complaints against Plaintiff from other employees (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 44-51, 53; Docket No. 35, Donohue Aff. ¶¶ 25-28, Ex. D; Docket No. 36, O'Malley Aff. ¶ 16).  Plaintiff strenuously disputes this (Docket No. 44, Pl. Response ¶¶ 43-48, 50-51, 53).  Her

motion for an adverse inference arises from lack of discovery from Defendant identifying the complaining employees or producing recordings of incidents (Docket No. 52).  Much of the papers submitted for all three pending motions focus on Plaintiff's relationships with her subordinates and whether incidents between them occurred or not (see Docket No. 34, Fulcinti Aff. ¶¶ 5, 6; Docket No. 36, O'Malley Aff. ¶¶ 11, 13-19; Docket No. 42, Minchen Aff. ¶¶ 44-45; Docket No. 40, Jones Aff. ¶¶ 17, 22-28; Docket No. 41, Hibbard Aff. ¶¶ 3, 10-14).  Some of the employee witnesses contrasted Plaintiff's demeanor with Donohue's demeanor (e.g., Docket No. 42, Minchen Aff. ¶¶ 46, 53; Docket No. 40, Jones Aff. ¶ 18; Docket No. 41, Hibbard Aff. ¶¶ 4-9, 33-34, 17-19 (subordinates disrespecting Plaintiff after watching Donohue's conduct with Plaintiff), 27 (Donohue observed being impatient with older staff)).

Jones states that Plaintiff managed Jones' department and Jones never heard Plaintiff yell at her subordinates, but Jones had heard Donohue "screaming at people from her office doorway on a daily basis" (Docket No. 40, Jones Aff. ¶¶ 17-18).  Jones also noted employees, primarily temporary workers, who frequently complained but she did not remember any complaining about Plaintiff (id. ¶¶ 20-21).  Jones denied that she ever complained about Plaintiff yelling at her, despite a document stating the contrary (id. ¶¶ 22-23, Ex. A (notation that Jones was yelled at on June 4 for assisting another employee who was not in her section)).  Jones also denied hearing Plaintiff yelled at another employee for wearing pajamas to work (id. ¶¶ 24-28, Ex. B).  Jones never saw Plaintiff fall asleep at work or surf the Internet at work (id. ¶¶ 29-30).

Plaintiff next asserts age discrimination in the handling of her fiftieth birthday. Plaintiff had arranged a small birthday celebration (see Docket No. 31, Def. Rule 56.1

Statement ¶ 60) and "specifically asked Ms. [Donohue] to keep information about my birthday confidential" (Docket No. 43, Pl. Aff. ¶ 157).  While other employees had a low-key acknowledgement of their birthday by Defendant, Plaintiff was subjected to a public party, with invitation of subordinates who were not intended for the event, and publication of her age (id. ¶¶ 159-60, 161-62; Docket No. 41, Hibbard Aff. ¶¶ 37-41).  But some Defendant's staff threw Plaintiff a surprise birthday party (Docket No. 31, Def. Rule 56.1 Statement ¶ 60; Docket No. 35, Donohue Aff. ¶ 23) with Donohue stating that "some employees [hung] up birthday signs" (Docket No. 35, Donohue Aff. ¶23).  To Donohue, Plaintiff "was extremely appreciative" (id.) but Plaintiff was mortified (Docket No. 43, Pl. Aff. ¶ 163).  Seeing the agents were excited about throwing her a surprise birthday party, however, Plaintiff thanked them with poetry (id. ¶ 164; see Docket No. 35, Donohue Aff. ¶ 23, Ex. C (with one verse noting her turning 50); Docket No. 31, Def. Rule 56.1 Statement ¶ 61).  Jones also recalled the celebration of Plaintiff's 50th birthday and distinguished it from other employees who would have a single sign in their cubicle acknowledging the day (Docket No. 40, Jones Aff. ¶¶ 33-36, Exs. C, D) with no mention of their age (id. ¶ 37).  Plaintiff complains that management should not have disclosed her impending birthday, her age, or the private party she intended to have (Docket No. 44, Pl. Response ¶ 61).

Plaintiff then compared her salary, responsibilities, and benefits to that of younger employees she believes were performing equivalent services (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 88-94).  Defendant counters that the people Plaintiff was

comparing herself to worked different positions (one in a different, affiliated company[3]) (Docket No. 31, Def. Rule 56.1 Statement ¶ 96-104, 88-94; Docket No. 35, Donohue Aff. ¶¶ 34-36) and Plaintiff never complained about the different treatment due to Plaintiff's age (Docket No. 31, Def. Rule 56.1 Statement ¶ 94).   Plaintiff contends that she did not complain about Senft's salary due to Senft's age (Docket No. 44, Pl. Response ¶ 94). Plaintiff was instructed by O'Malley when she raised this complaint that Plaintiff should not compare herself with other employees and, when she persisted, O'Malley gave Plaintiff a final warning to stop making those comparisons (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 104-05 (considering Plaintiff's persistence in such comparisons to be "borderline insubordination"), 107).   During her deposition, Plaintiff testified that she did not know Senft's precise age but believed her to be younger (id. ¶ 93).   As for Jennifer Michael, Defendant contends that her duties differed from Plaintiff and Plaintiff was paid more than Michael (id. ¶¶ 99-102, 103).   Plaintiff responds that Jennifer Michael left work early for personal or family reasons and infrequently traveled out of town for company business (Docket No. 44, Pl. Response ¶¶ 101, 102)

Plaintiff filed charges with the Equal Employment Opportunity Commission ("EEOC") on December 26, 2013 (Docket No. 31, Def. R. 56.1 Statement ¶ 138; see Docket No. 1, Compl. Ex. 1).   Plaintiff received her right to sue letter (Docket No 1, Compl., Ex. 2) and commenced the present action on October 16, 2014 (Docket No. 31, Def. Statement ¶ 139).

---

[3]Although later, Defendant consolidated certain back office functions with Capital Management Services, rendering Plaintiff's former business analyst position redundant, Docket No. 35, Donohue Aff. ¶ 38.

2.   Defendant's Arguments for Summary Judgment

Defendant argues that Plaintiff fails to state an age discrimination claim as a matter of law by not showing that her age was the "but for" cause for an adverse employment action (Docket No. 32, Def. Memo. at 11-12).  Following discovery, Defendant learned that Plaintiff's claims were time barred.  For a timely ADEA claim, a plaintiff needs to file a charge with the EEOC within 300 days of the alleged discriminatory act, 29 U.S.C. § 626(d)(1)(B) (id. at 12).  Defendant thus argues that any actions that occurred before March 1, 2013 (within 300 days of the December 26, 2013, EEOC charge), including period when Plaintiff was department manager and particular disparate treatment incidents, assignments when she was a business analyst in 2012, are time-barred (id. at 12-14).

Defendant next argues that Plaintiff fails to establish a prima facie case of age discrimination for incidents that occurred within the limitations period (id. at 14-19).  She fails to allege incidents that rise to the level of an adverse employment action (id. at 14-16) or make allegations that give rise to an inference of age discrimination (id. at 16-19).  Allegations of criticism from a supervisor and unfavorable work assignments (as alleged here) do not rise to the level of an adverse employment action (id. at 15, citing Boza-Meade v. Rochester Hous. Auth., 170 F. Supp. 3d 535, 546 (W.D.N.Y. 2016) (Wolford, J.); Focarazzo v. University of Rochester, 947 F. Supp. 2d 335, 339 (W.D.N.Y. 2013) (Larimer, J.); see also id. at 15-16 (citing Szarzynski v. Roche Labs, Inc., No. 07CV6008, 2010 U.S. Dist. LEXIS 17883, at *31 (W.D.N.Y. Mar. 1, 2010) (Telesca, J.) ("the ADEA is not aimed at policing personalities in the workplace")); Docket No. 54, Def. Reply Memo. at 2.  For example, Donohue was instrumental in creating the business analyst position

16

for Plaintiff after First Niagara Bank terminated its relationship with Defendant and rendered its First Niagara Bank department (and Plaintiff's managerial position) redundant, which Defendant argues belies a discriminatory intent (id. at 17).  Defendant also denies that Senft, a Capital Management Services executive assistant, was in an equivalent position to Plaintiff's to compare for age discrimination claim (id. at 18; Docket No. 31, Def. Rule 56.1 Statement ¶¶ 89-91).  Defendant asserts it has legitimate, nondiscriminatory reasons for its actions regarding Plaintiff (Docket 32, Def. Memo. at 20-22).  Next, Defendant argues that Plaintiff has not stated a prima facie case of disability discrimination (id. at 22-28).

Defendant next argues that Plaintiff alleges vague, conclusory hostile work environment and retaliation claims (id. at 28-32).  Defendant contends that it was impossible to tell that any given facts are offered to attempt to articulate a hostile work environment (id. at 28).  As argued opposing Plaintiff's age claim generally, Defendant contends Plaintiff assembled criticism, harsh treatment, and close scrutiny from Donohue, Defendant's investigation of subordinates' complaints against Plaintiff did not state an actionable hostile work environment claim (id. at 29-30).  Plaintiff attributed hostility from Donohue arising from Donohue's relationship with Dan Abadir, Plaintiff's brother; this personal disagreement is not actionable as age discrimination under the ADEA (id. at 30).  Plaintiff's retaliation claim fails because she did not put Defendant on notice of her complaints in March 2013 (id. at 31).  Alternatively, Defendant argues that actions Plaintiff complains of (not getting a raise in May 2013, being told not to compare her circumstances with a person in a different position, and loss of company cellphone) were taken for legitimate, non-retaliatory reasons (id. at 31-32).

3.  Plaintiff's Response

Plaintiff withdraws her disability discrimination claim  (Docket No. 48, Pl. Memo. at 4).  She nevertheless contends that there are material issues of fact precluding summary judgment against her remaining claims (id. at 13).  For her hostile work environment claim, Plaintiff argues that otherwise time-barred conduct and events may be considered to assess liability so long as "an act contributing to that hostile environment takes place within the statutory time period," National R.R. Passenger Corp. v. Morgan, 556 U.S. 101, 105 (2002) (id.).  Plaintiff contends that these discrete acts (both before and after the EEOC limitations period) constitute a continuous unlawful employment practice (id., citing National R.R. Passengers Corp. supra, 536 U.S. at 105).  She claims a "continuous barrage of abusive treatment based upon her age dating from at least September 2011 when Ms. Donohue accused Ms. Abadir of stealing time from the Employer while Ms. Abadir was working more than 15 hours of overtime in a month, . . . , until the Defendant's refusal to reinstate her to her position after a medical leave of absence that should have ended in September 2013" (id. at 14).

Plaintiff contends that Donohue favored employees significantly younger than Plaintiff (Docket No. 48, Pl. Memo. at 15).  She argues that Donohue was trying to discredit Plaintiff in a number of ways.  During the First Niagara Bank conversion, Donohue wrote handwritten complaints purportedly from Plaintiff's subordinates (id. at 16-17; Docket No. 46, Pl. Appx. M, at 421-42; Docket No. 44, Pl. Statement, Pl. Appx. C, Lane Dep. Tr. at 160-62).  Jones, listed as one of the complaining subordinates, denies complaining about Plaintiff (Docket No. 48, Pl. Memo. at 17; Docket No. 40, Jones Aff. ¶¶ 22-23).  Jones and Hibbard stated that there were agents that complained generally

18

during the First Niagara Bank conversion, but none specifically complained about Plaintiff (Docket No. 41, Hibbard Aff. ¶¶ 14-16; Docket No. 40, Jones Aff. ¶¶ 19-21; Docket No. 48, Pl. Memo. at 18).  Defendants human resources department, which usually maintained detailed records, does not have record of these subordinate complaints (Docket No. 48, Pl. Memo. at 17).  Donohue also belittled Plaintiff in front of Plaintiff's staff by making faces behind Plaintiff's back (id. at 16).

Plaintiff notes that she was not a favorite of Donohue, who tended to favor younger employees and managers (Docket No. 43, Pl. Aff. ¶¶ 168-71; Docket No. 41, Hibbard Aff. ¶¶ 20-21, 24).  Plaintiff observed that Donohue was short-tempered with other, older employees (Docket No. 43, Pl. Aff. ¶ 172) and other employees noted that Donohue was impatient with older staff and older persons at First Niagara Bank (Docket No. 48, Pl. Memo. at 15; Docket No. 43, Pl. Aff. ¶¶ 101-04, 168-71; Docket No. 41, Hibbard Aff. ¶¶ 7 (Donohue "screaming at her own mother who was a Customer Service Representative"), 27).

Plaintiff says she made age discrimination complaints to Defendant's human resources and executives; for example, Plaintiff told Lane that Donohue favored younger employees (Docket No. 43, Pl. Aff. ¶ 191) but Lane said she could not help her because Lane reported to Donohue (Docket No. 48, Pl. Memo. at 21).  She also contends that Fulcinti did not include in her notes of their March 11, 2013, conversation Plaintiff's age-based complaints (id. at 23).

D.  Defendant's Motion for Sanctions (Docket No. 30)

1.  Defendant's Contentions

Plaintiff began treatment with Dr. John Northman, Ph.D., on May 30, 2013, in which she discussed her work relationship issues with Donohue (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 120, 121).  The parties debated what Plaintiff told Dr. Northman the reason for her dispute with Donohue, whether Donohue was taking her frustrations with Plaintiff's brother out on Plaintiff or was Donohue manifesting her age bias (Docket No. 44, Pl. Response ¶¶ 122-24).  Plaintiff claims that she told Dr. Northman that Donohue was mistreating her and that she favored other employees (id. ¶ 124).

Plaintiff was deposed on December 21, 2013, including questioning about her treatment by Dr. Northman (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 140-45; cf. Docket No. 44, Pl. Response ¶ 145).  Defendant claims that Plaintiff sent Dr. Northman an email on December 22, 2015, after her deposition purporting to "correct" her treatment records (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 146, 153; Docket No. 38, Def. Atty. Affirm. ¶ 11, Ex. L).  Defendant contends that Plaintiff contacted Dr. Northman to add to her treatment record her statement that she was being treated worse than younger managers by Donohue, even though that was not included in the clinical notes from her discussions with Dr. Northman (Docket No. 31, Rule 56.1 Statement ¶¶ 146-47).  Plaintiff then instructed Dr. Northman to keep that email confidential and not to disclose it to any of the lawyers (id. ¶ 148).  Plaintiff wrote that the purpose of this email was to "clarify the details" if Dr. Northman was "asked about [her] history in the future should [he] be asked to appear in court" (id. ¶ 149).

Plaintiff disputes this; she only sent the email to correct a statement about her history, that she voluntarily left a job in California rather than being terminated (Docket No. 44, Pl. Response ¶ 145).  She also denies adding to Dr. Northman's record about examples of how Donohue and Defendant treated her as compared with younger managers (id. ¶¶ 145-46).

Defendant subpoenaed Dr. Northman on February 18, 2016, but he refused to testify without Plaintiff signing a release to allow his testimony, which Plaintiff refused to do (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 150-51).  On February 19, 2016, Plaintiff sent Dr. Northman a second email asserting that Donohue treated her differently than younger employees (id. ¶ 152).  Plaintiff, however, did not produce the December 2015 and February 2016 emails (id. ¶ 153).  Dr. Northman eventually was deposed, and it was then that Defendant learned of these emails (id. ¶¶ 155-57).

Defendant concludes that these facts show Plaintiff's bad faith conduct that warrants this Court's exercise of its authority to sanction Plaintiff (including drawing an adverse inference against Plaintiff or dismissal of this action) (Docket No. 32, Def. Memo. at 34-35); Kalwasinski v. Ryan, No. 96CV6475, 2007 U.S. Dist. LEXIS 68736, at *4-10 (W.D.N.Y. Sept. 12, 2007) (Feldman, Mag. J.) (in consent case, dismissing pro se inmate's complaint for his threats to defense counsel).  Defendant also seeks award of attorney's fees and costs incurred after Plaintiff's deposition (id. at 35).

2.  Plaintiff's Response

Plaintiff denies obstructing discovery (Docket No. 48, Pl. Memo. at 25).  Plaintiff did not ask Dr. Northman to change his records and the doctor did not alter those records (id.; Docket No. 43, Pl. Aff. ¶ 357).  Plaintiff stated that she intended only to clarify the

clinical record regarding her employment before working for Defendant (Docket No. 43, Pl. Aff. ¶¶ 353-56).

Dr. Northman later testified that he did not know what Plaintiff intended with her email (Docket No. 48, Pl. Memo. at 25; Docket No. 47, Pl. Appx. F, Dr. Northman Dep. Tr. at 60-61, 63-65, 67; see also Docket No. 33, Def. Ex. G, Dr. Northman Tr. at 61-62). Unclear of what Plaintiff sought in the second email to Dr. Northman of the evening of December 12, 2015, Dr. Northman did nothing to the clinical record (Docket No. 47, Pl. Appx. F, Dr. Northman Tr. at 63-64, referencing deposition Ex. 13, reproduced as Docket No. 33, Ex. L). Dr. Northman had ceased treating Plaintiff when the email was sent (in fact Dr. Northman had retired) and he felt her clinical record "was long closed at that time" (Docket No. 47, Pl. Appx. F, Dr. Northman Tr. at 64, 61). When asked again whether Plaintiff was trying to have the doctor alter his clinical records, Dr. Northman said, "I don't know, possibly, but I really don't know," stating that he would need "to have a deeper discussion with her about all that" (id., Tr. at 65). Later, Dr. Northman was asked if he believed that Plaintiff was suggesting changes to that record and again the doctor did not know is she was suggesting changes "or just suggesting that I understand something that she believes I may have misunderstood if I was to be asked to testify" (id., Tr. at 67), possibly to influence Dr. Northman's testimony (id.).

E.  Plaintiff's Motion for Adverse Inference (Docket No. 52)

Plaintiff moves for an adverse inference from Defendant failing to produce records from disgruntled subordinates and documentation on certain accusations against Plaintiff (Docket No. 52). Donohue accused Plaintiff of misconduct, leading to Plaintiff's brief termination in 2012 (Docket No. 52, Pl. Memo. at 1 & n.1). She now argues that

Defendant failed to preserve or destroyed evidence of those complaints (id. at 1-2). Plaintiff pointed to testimony of the existence of interview notes that were not produced (id. at 3). She terms this spoliation that would require an adverse inference that the records that were not preserved or produced would support her contentions (id. at 4-7).

Defendant counters that Plaintiff has not identified any evidence which indicates that any such records ever existed or that Defendant failed to preserve or destroyed them (Docket No. 59, Def. Memo. at 1, 2). As for surveillance footage at Defendant's office (cf. Docket No. 52, Pl. Memo. at 3), Defendant argues that those recordings are preserved only for 90 days (Docket No. 59, Def. Memo. at 2). Finally, Defendant asserts that Plaintiff cannot show that the missing evidence would have supported her claims (id. at 3).

In reply, Plaintiff argues that Defendant does not mention that its Human Resources department conducted an internal investigation and Defendant had not produced from that investigation (Docket No. 61, Pl. Reply Memo. at 1). She argues that Human Resources could have pulled from the surveillance video system but did not (id. at 2). Plaintiff need not prove that the nonexistent record in order to obtain the adverse inference, otherwise that requirement would make the motion illogical (id. at 3). She contends that the interviews of witnesses that Lane testified occurred were not preserved, establishing the knowing culpable state of mind of Defendant in destroying these interview records (id.; see Docket No. 44, Ex. C, Dep. Betty Lane Tr. at 56-57).

F.  Defendant's Motion to Strike Yolanda Jones Affidavit (Docket No. 56)

Defendant argues that Yolanda Jones' affidavit (Docket No. 40) should be stricken because Plaintiff failed to identify her as a witness, either at initial disclosure or in subsequent or supplemental discovery (Docket No. 56). Defendant contends Plaintiff's

omission was not substantially justified or harmless (Docket No. 57, Def. Memo. at 2). Jones denied Plaintiff yelled at her (Docket No. 40, Jones Aff. ¶¶ 22-23) or other employees (id. ¶¶ 24-27) despite documents to the contrary (id., Ex. A; Docket No. 58, Def. Atty. Affirm., Ex. A, Jones Aff. ¶¶ 22-23, 24-27).   Defendant claims prejudice here because it learned of Jones as a witness in response to its motion for summary judgment (Docket No. 57, Def. Memo. at 4).

Plaintiff responds that her current attorney came into this case 2016, about two years after filing the Complaint (Docket No. 62, Pl. Memo. at 1-2).  With new counsel, Plaintiff sought identification of potential witnesses (present and former employees) (id. at 2).  On January 24, 2017, Plaintiff's counsel requested Defendant identify employees listed in an exhibit (id. at 2-3, citing Item No. 51, page 19 of 21, Bates No. D000445)). Noting that this Court had the discretion to admit Jones' testimony and impose lesser sanction than suppression, Plaintiff argues that she gave a reasonable explanation why she failed to disclose Jones as a witness (id. at 3-4).  Plaintiff wanted to avoid calling present employees of Defendant out of concern for their potential loyalties and was not aware of Jones' employment status with Defendant (especially since Jones was a supervisor) (id. at 4).  Plaintiff cites this Court's decision in Coleman v. City of Niagara Falls, No. 09CV157, 2015 WL 4208602, at *2, 3 (W.D.N.Y. July 10, 2015) (Skretny, J.), in which this Court allowed that plaintiff's medical expert's testimony despite failing to disclose the experts, permitting those defendants to depose the doctors prior to trial (id. at 4-5).

Defendant replies that Plaintiff's explanation for not naming Jones sooner was unavailing (Docket No. 63, Def. Reply Memo. at 1-2).  Plaintiff had identified current

employees of Defendant (<u>id.</u> at 2-3), so her argument explaining she did not name Jones because of loyalty issues is unsupported (<u>id.</u> at 3).  Plaintiff never notified Defendant of her intention to use Jones as a witness (<u>id.</u> at 4), <u>cf.</u> Fed. R. Civ. P. 26(e)(1).  Defendant did not have an opportunity to depose Jones because she was never identified as a witness (<u>id.</u> at 5).  Although Defendant was aware of Jones, it did not know she would be a witness in order to question her (<u>id.</u> at 5-6; <u>see</u> Docket No. 57, Def. Memo. at 5).  On Plaintiff's argument that Jones' testimony is important enough to excuse the failure to disclose, Defendant counters that Jones' affidavit does not create a material issue of fact, since it refutes two accusations against Plaintiff in a 2012 investigation (Docket No. 63, Pl. Reply Memo. at 6-7).

## III.   DISCUSSION

A.  Applicable Standards

1.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  A fact is "material" only if it "might affect the outcome of the suit under governing law," <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A "genuine" dispute, in turn, exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party," <u>id.</u>  In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion," <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158-59 (1970) (internal quotations and citations omitted).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper," Bryant v. Maffucci, 923 F.32d 979, 982 (2d Cir. 1991) (citation omitted).  Indeed "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper," Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82,-83 (2d Cir. 2004) (citation omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," Anderson, supra, 477 U.S. at 249.

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," Cordiano v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009), citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "Where the moving party demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting Celotex, supra, 477 U.S. at 323).  The party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis in original removed).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a).  The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the nonmovant.  Ford, supra, 316 F.3d at 354.

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a)(1), (2).  The movant is to submit facts in which there is no genuine issue, id. R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, id. R. 56(a)(2).  Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, id.  Absent such an opposing statement, the facts alleged by the movant are deemed admitted.  Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, id. R. 56(a)(3).

2.  Age and Disability Discrimination

For an age discrimination claim under the ADEA, the Title VII McDonnell Douglas burden shifting[4] applies (Docket No. 32, Def. Memo. at 11), see Gorzynski v JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).  That is, Plaintiff bears the burden of demonstrating that age was a motivating factor in the adverse employment action.  She bears the burden of establishing a prima facie case of discrimination.  If Plaintiff does so, the burden shifts to Defendant  to articulate some legitimate, nondiscriminatory reason for its action.  If that has been met, the burden shifts to Plaintiff to show, beyond the prima facie case, that Defendant's determination was the result of discrimination.  Gorzynski, supra, 596 F.3d at 106 (citations omitted).  Under Gross v. FBL Financial Services, 557 U.S. 167, 180 (2009), "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action," and not mere contributing factor, Gorzynski, supra, 596 F.3d at 106.

To establish a prima facie case of age discrimination, Plaintiff must show (1) that she was within the protected age group; (2) that she was qualified for the position; (3) that she experienced an adverse employment action; and (4) such action occurred under circumstances giving rise to an inference of discrimination, Gorzynski, supra, 596 F.3d at 107 (Docket No. 32, Def. Memo. at 14).

Again using the McDonnell Douglas burden shifting for the Americans with Disability Act claim (see No. 32, Def. Memo. at 22, see Sista v. CDS Ixis N. Am., Inc., 445 F.3d 161, 169 n.2 (2d Cir. 2006)), Plaintiff had to establish her prima facie case that

---

[4]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

28

she was disabled, that is that she suffered from a physical or mental impairment, identified

an activity that has been impaired and show that it is a "major life activity," and show that

the impairment "substantially limits" that major life activity, see Weixel v Board of Educ.

of N.Y., 287 F.3d 138, 147 (2d Cir. 2002) (Docket No. 32, Def. Memo. at 23).

   3.   Hostile Work Environment

To oppose summary judgment on a hostile work environment claim, this Court

once held that the plaintiff "must elicit evidence '(1) that the workplace was permeated

with discriminatory intimidation that was sufficiently severe or pervasive to alter the

conditions of her work environment, and (2) that a specific basis exists for imputing the

conduct that created the hostile environment to the employer,'" Mento v. Potter,

No. 08CV74, 2012 WL1908920, at *14 (W.D.N.Y. May 21, 2012) (Skretny, C.J.) (quoting

Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir.) (internal quotations and alterations

omitted), cert. denied, 540 U.S. 1016 (2003)); see Harris v. Forklift Sys., Inc., 510 U.S.

17, 21 (1993).   "'The sufficiency of a hostile work environment claim is subject to both

subjective and objective measurement:  the plaintiff must demonstrate that she personally

considered the environment hostile, and that the environment rose to some objective level

of hostility.'  Leibovitz v. N.Y.C. Transit Auth., 252 F.3d 179, 188 (2d Cir.2001)," Mento,

supra, 2012 WL 1908920, at *14.  As described in Mento,

> "'Absent extraordinary severity, a plaintiff must show that a "series of
> incidents were sufficiently continuous and concerted to have altered the
> conditions of her working environment."' George v. Liverpool, No. 97–CV–
> 1232, 2000 WL 1499342, at *6 (N.D.N.Y. Sept. 29, 2000) (quoting Cruz v.
> Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).  Factors to consider
> in examining whether a work environment is sufficiently hostile or abusive
> to support a Title VII claim include 'the frequency of the discriminatory
> conduct; its severity; whether it is physically threatening or humiliating, or a
> mere offensive utterance; and whether it unreasonably interferes with an
> employee's performance.'  Leibovitz, 252 F.3d at 188; see also Schiano v.

Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006).  The appropriate test is whether the 'harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'  Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997)."

Mento, supra, 2012 WL 1908920, at *14.  Plaintiff needs to demonstrate that she was subject to hostility because of her membership in a protected class, here due to her age, Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999); thus an environment harsh to both young and old "does not constitute a hostile working environment under the civil right statutes," id.  "Isolated, minor acts or occasional episodes do not warrant relief," id.  As noted by Judge Larimer in Kuder v. City of Rochester, 992 F. Sup.2d 204, 212 (W.D.N.Y. 2014), "a few isolated incidents of 'boorish or offensive use of language' are generally insufficient to establish a hostile work environment (quoting Bennette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 251 (W.D.N.Y. 2003) (Larimer, J.).

For an ADEA claim, plaintiff has to show that age was the only reason for the unwanted conduct, Bauers-Toy v. Clarence Cent. Sch. Dist., No. 10CV845, 2015 U.S. Dist. LEXIS 193758, at *12-13 (W.D.N.Y. Sept. 30, 2015) (Arcara, J.).

4.  Retaliation

To state a retaliation claim, Plaintiff again must make out a prima facie case that she was engaged in a protected activity, that her employer knew was protected, that she suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action, Buchalo v. Shelter Is. Union Free Sch. Dist., 691 F.3d 119, 129 (2d Cir. 2012) (Docket No. 32, Def. Memo. at 30-31); Gorzynski, supra, 596 F.3d at 107,110.

5.   Motions for Adverse Inference, Striking the Affidavit, and Discovery Sanctions

Both parties seek discovery sanctions for nondisclosure, in Plaintiff's motion for an adverse inference for Defendant's failure to produce records from employee complaints about Plaintiff's management, Defendant's motion to strike Yolanda Jones' affidavit for not disclosing her as a witness, and its motion for sanctions for Plaintiff allegedly seeking her psychologist to alter medical records.

An adverse inference "is a severe sanction that is 'reserved for egregious conduct or for situations in which the loss of relevant evidence has so prejudiced the moving party that . . . an adverse inference is necessary to restore the moving party to its pre-loss position,'" Riley v. City of N.Y., No. 10CV2513, 2015 WL 541346, at *12 (E.D.N.Y. Feb. 10, 2015) (quoting Riley v. Marriott Int'l, Inc., No. 12CV6242, 2014 WL 4794657, at *7 (W.D.N.Y. Sept. 25, 2014) (Payson, Mag. J.) (collecting cases)).  Discovery under the Federal Rules is intended to reveal relevant documents and testimony, but this process is supposed to occur with a minimum of judicial intervention.  See 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2288, at 512 (Civil 3d ed. 2010).

> "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit,"

Fed. R. Civ. P. 26(b)(1).  Initial disclosure includes producing the names of each individual likely to have discoverable information, Fed. R. Civ. P. 26(a)(1)(A)(i).

31

"A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense," Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) (Docket No. 52, Pl. Memo. at 4). Rule 37(e) was amended in 2015 to address when electronically stored information is not preserved, with instruction of the jury as one form of relief "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," Fed. R. Civ. P. 37(e)(2), (e)(2)(B). The parties here have not indicated that the personnel records (such as audio and video recordings) Plaintiff sought were electronically stored.

Rule 26(a) requires parties to identify the names of persons "likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, Fed. R. Civ. P. 26(a)(1)(A)(i). Parties also have an ongoing obligation to supplement their disclosure and discovery regarding the identity of witnesses, id., R. 26(e)(1). If a party "fails to do so it runs the risk that the court will refuse to receive testimony from the person whose name was not given pursuant to the 'automatic' exclusion provision of Rule 37(c)(1), and that it may take other action appropriate under the circumstance," 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2013, at 287 (3d ed. 2010). Under Rule 37(c)(1), a party would not be allowed to use the information from the undisclosed witness "unless the failure [to identify that witness] was substantially justified or is

harmless." Upon notice and opportunity to be heard, this Court may impose additional or alternative sanctions for this failure by imposing reasonable expenses (including attorneys' fees), inform the jury of this failure, or impose other sanctions listing in Rule 37(b)(2)(A) (i)-(vi), id., R. 37(c)(1)(A)-(C); the Rule 37(b) sanctions include taking facts as established as the prevailing party claims (essentially an adverse inference), prohibiting the disobedient party from supporting the claim or introducing designated matters in evidence, id., R. 37(b)(2)(A)(i), (ii).

The list of Rule 37(b)(2)(A) sanctions are not exclusive and this Court may apply these sanctions individually or together to issue an Order that is just for the circumstances, 8B Charles A. Wright, Arthur R. Miller and Richard L. Marcus, Federal Practice and Procedure § 2284, at 436-37 (2010). This Court enjoys broad discretion in determining and imposing the appropriate sanction, id. at 439, 444.

Defendant moves to sanction Plaintiff for alleged witness tampering (Docket No. 30, Def. Memo. at 32-35). This Court has an inherent authority to control the conduct of the parties before it (id. at 34-35), Kalwasinski, supra, 2007 U.S. Dist. LEXIS 68736, at *4-5. This Court also enjoys wide discretion in determining the appropriate sanction for discovery abuses, Riley v. City of N.Y., supra, 2015 WL 541346, at *12 (rejecting dismissal of the action for lesser sanction for plaintiff's witness tampering). In Riley, where that plaintiff's witness tampering led to motion practice and an evidentiary hearing, the court imposed monetary sanction of attorneys' fees and costs instead of dismissal of the action and, finding imposition of such sanctions not sufficient to deter this type of misconduct, an adverse inference jury instruction, id.

B. Motions Preliminary to Summary Judgment Motion; Plaintiff's Motion for Adverse Inference (Docket No. 52) and Defendant's Motion to Strike (Docket No. 56)

This Court will first consider the two motions (Docket Nos. 52, 56) seeking to infer from the absence of evidence or to strike evidence produced either in support of or in opposition to the summary judgment motion and conclude with Defendant's motion for discovery sanctions (Docket No. 30) after deciding its motion for summary judgment (id.). Plaintiff moved (Docket No. 52) for an adverse inference from Defendant not producing records of her former subordinates' complaints against Plaintiff and audio video recordings to establish Plaintiff's conduct at work. Defendant moves (Docket No. 56) to strike former employee Yolanda Jones' affidavit (Docket No. 40) because Plaintiff failed to disclose Jones as a potential witness.

Plaintiff's treatment and interactions with her subordinates has been introduced in the summary judgment motion and in the predicate evidentiary motions to strike Ms. Jones' affidavit and for an adverse inference to Plaintiff from the lack of production from Defendant. Both sides debate whether subordinates complained of Plaintiff's management. These matters, however, arise before the limitations period of 300 days prior to Plaintiff filing her EEOC charge. Thus, these disputed evidentiary matters may not be relevant to Defendant's summary judgment motion on Plaintiff's age discrimination claim.

1. Plaintiff's Motion for Adverse Inference (No. 52)

Plaintiff argues that Defendant failed to preserve or produce audio and video recordings and documents from present and former employees managed by Plaintiff with their purported complaints about her management of them (Docket No. 52). As for the

video recordings, Defendant had an internal 90-day preservation policy for the surveillance recording (Docket No. 60, Def. Atty. Decl. Ex. A, Cara Robinson Tr. at 20; Docket No. 59, Def. Memo. at 2).

For Plaintiff's adverse inference motion, she has to show that Defendant acted with a culpable state of mind in destroying records of subordinates' complaints. This Court notes that, aside from Plaintiff's witnesses Shaina Hibbard and Yolanda Jones, no other subordinates were produced to testify as to their treatment by Plaintiff. The only other record is Defendant's human resource records and testimony of human resource and executive officials.

Since the subordinate complaints arose before March 2013, Plaintiff's claim arising therefrom is time barred. Her motion for an adverse inference surrounding these facts thus **is moot**.

Plaintiff also argues that human resources would have access to audio and video recording of activities in Plaintiff's office, revealing whether she slept at her desk or surfed the Internet as Defendant accuses. These facts may include instances after March 2013 since Defendant makes general accusations of sleeping and surfing the Internet on the job (see Docket No. 31, Def. Rule 56.1 Statement ¶ 85; Docket No. 36, O'Malley Aff. ¶ 34, Ex. H; Docket No. 35, Donohue Aff. ¶ 11). Plaintiff vehemently denies these accusations (Docket No. 44, Pl. Response ¶ 85). The record here discussed in some detail only the napping allegation; aside from Donohue's mention that Plaintiff "was known" to surf the Internet (Docket No. 35, Donohue Aff. ¶ 11) there is no other reference to unauthorized use of company equipment.

As for the instances of napping on the job, no dates are given for when Plaintiff allegedly did this.  Louis Vertino's recorded conversation with Lane was dated March 13, 2013, but there he stated that Plaintiff previously was sleeping on the podium (where her desk was located) that Vertino did not witness himself but the instances were frequent enough that other managers joked about it (Docket No. 36, O'Malley Aff. ¶ 34, Ex. H). Vertino does not state when those prior instances of napping occurred or whether it continued through March 2013.  Also, there are no dates for instances when Plaintiff allegedly surfed the Internet on office hours.  To be applicable for Plaintiff's timely ADEA claim, these instances need to have occurred after March 2013 within 300 days of her EEOC charge but there is no record when these instances occurred.

Given the lack of clarity of the record when Plaintiff allegedly napped at work or surfed the Internet to decide whether to impose an adverse inference, this Court **declines** to grant Plaintiff's motion for an adverse inference on whether or not she napped or surfed the Internet on Defendant's time.  The evidence is what it is (as scant as it may be); this Court will not take the additional step and find the facts as Plaintiff purports.  Therefore, Plaintiff's Motion for an Adverse Inference (Docket No. 52) is **denied in part and deemed moot**.

## 2.  Defendant's Motion to Strike Yolanda Jones' Affidavit (No. 56)

Plaintiff introduced the affidavit of former Defendant employee Yolanda Jones (Docket No. 40) in opposition to the summary judgment motion.  Plaintiff, however, did not identify Jones in her initial disclosure of witnesses (Docket No. 58, Def. Atty. Affirm. ¶¶ 6-12).  Plaintiff was represented by one attorney when she filed suit and produced initial disclosure and discovery, with current counsel taking over about November 23,

36

2016 (Docket No. 62, Pl. Aff. ¶¶ 3-4).  Plaintiff claims that she was reluctant to reach out to then-current employees of Defendant concerning the litigation (Docket No. 62, Pl. Aff. ¶ 11; Docket No. 62, Pl. Memo. at 3).  In January 2017, Plaintiff's counsel sought a list of employees Defendant claims complained about Plaintiff and who were no longer working for Defendant (Docket No. 62, Pl. Aff. ¶ 13).  Ms. Jones was on that list, but Defendant did not respond to Plaintiff's disclosure request (id. ¶¶ 14-15).  Because Ms. Jones was believed to still be employed at Defendant, Plaintiff did not contact her (id. ¶ 16).  After Defendant moved for summary judgment, Plaintiff learned that Ms. Jones was no longer with Defendant and Plaintiff felt comfortable enough to contact Ms. Jones (id. ¶ 17).  Once Plaintiff and Ms. Jones spoke, Plaintiff learned that Ms. Jones could refute accusations against Plaintiff from their days with Defendant (id. ¶ 18).

Defendant now argues that Plaintiff was still obliged to name Jones as a potential witness and that she had numerous opportunities prior to the summary judgment motion to do so (Docket No. 57, Def. Memo. at 2-5; Docket No. 63, Def. Reply Memo. at 1-4).  Plaintiff sought information from Defendant about terminated employees but did not include Jones in that list (Docket No. 63, Def. Reply Memo. at 3-4).  Contrary to her argument, Plaintiff did name witnesses who remain employed by Defendant (id. at 2-3; Docket No. 66, O'Malley Aff. ¶¶ 5-6), but not Jones.

Failing to name Jones was not substantially justified.  Plaintiff's rationale, that she wanted to avoid contacting Defendant's current employees to avoid conflicted loyalties, did not justify not naming Jones.  As Defendant points out (Docket No. 63), Plaintiff did name Defendant's current employees who would possess conflicted loyalty that Plaintiff sought to avoid by not disclosing Jones as a witness.  Nothing required Plaintiff to wait

until a potential witness no longer worked for Defendant to name them as a witness in her favor despite their loyalties.  Plaintiff made strategic decision not to use Jones while she was a supervisor at Defendant then changing her position when Jones was no longer employed by Defendant.

Failing to name Jones, however, was harmless.  First, Jones' testimony involves pre-March 2013 events (whether Plaintiff's subordinates in the First Niagara Bank conversion complained and the conduct of the office's 50th birthday celebration) that are time barred for an ADEA claim.  Jones was supervised by Plaintiff until the end of 2012 (Docket No. 40, Jones Aff. ¶ 2), again before the March 1, 2013, limitation period for ADEA claims began; Jones does not testify to events from March 1, 2013, even though she was employed by Defendant through 2017 (id. ¶¶ 1, 4).  As discussed below in this Decision and Order, events in 2012 predate her EEOC 2013 charge.  Plaintiff also did not know Jones' status with Defendant.

With Jones' affidavit discussing pre-2013 events, its exclusion because of Plaintiff's failure to disclose Jones as a witness is harmless and Defendant's motion to strike (Docket No. 56) is **denied**.

C.  Defendant's Motion for Summary Judgment (Docket No. 30)

1.  Timeliness of Age Discrimination Claim

EEOC charge filed December 26, 2013 (Docket No. 31, Def. Rule 56.1 Statement ¶ 138). 300 days prior to this is March 1, 2013 (Docket No. 32, Def. Memo. at 11-12), so events prior to that date are time-barred.  Included are what occurred since Plaintiff joined Defendant, her work on the First Niagara Bank account (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 2, 9, 31), and the office celebration of her 50th birthday in July 2011.

Plaintiff's chief age discrimination complaints arise from this surprise party and public disclosure of her age and her treatment of subordinates during the First Niagara Bank conversion.

Plaintiff's complaints about disparate treatment during the period of the First Niagara Bank account (see Docket No. 1, Compl. ¶¶ 19-20, 25-26) are thus **time barred** as is the references to Plaintiff turning 50 in 2011 (id. ¶ 27; Docket No. 31, Def. Rule 56.1 Statement ¶ 60; see Docket No. 44, Pl. Response to Def. Rule 56.1 Statement ¶ 60), Plaintiff's tardiness being sanctioned while other managers were not (Docket No. 1, Compl. ¶ 23; Docket No. 31, Def. Rule 56.1 Statement ¶¶ 66-70), and Plaintiff's comparison with Jennifer Michael in December 2012 (Docket No. 36, O'Malley Aff. ¶ 25). Plaintiff argues that these pre-300-day events can be used so long as some discriminatory event occurred within the 300-day period (Docket No. 48, Pl. Memo. at 13-14).

Plaintiff was one of the older employees at Defendant, which hired many employees as their first employment.  The rollout of the First Niagara Bank conversion brought on additional new employees, with Defendant assigning either new employees or those who did not work well in other departments to the First Niagara Bank conversion (Docket No. 42, Minchen Aff. ¶¶ 17-18).  The employees were assigned to the conversion because it was scripted and seen as easy to perform (respond to calls and log the calls) (id.).  What is not established is whether this assignment of staff and Plaintiff to manage them was due to Plaintiff's age.  Even if so, the assignment predates the limitations period.

Reviewing events after March 1, 2013, Plaintiff made complaints to human resources and Defendant's executives  (Docket No. 31, Def. Rule 56.1 Statement ¶ 71).

On March 11, 2013, Plaintiff complained to Fulcinti that Donohue was too critical of Plaintiff in preparing a spreadsheet and a report that younger employees had not completed years before (id. ¶¶ 71-73).  Plaintiff argues that she told Fulcinti that Donohue favored younger, less mature associates (Docket No. 44, Pl. Response ¶ 78).  Plaintiff then complained about Donohue's scrutiny of how long Plaintiff took to work (Docket No. 31, Def. Rule 56.1 Statement ¶ 80), but this is when she was a business analyst and Plaintiff made no comparison with younger staff.  Plaintiff was disciplined in May 14, 2013, about her comparing others to herself in her annual review (id. ¶¶ 86-97).  Plaintiff renewed her comparison with Jennifer Michael in discussion with O'Malley on May 14, 2013 (id. ¶ 106; Docket No. 36, O'Malley Aff. ¶ 28).  The last incident prior to Plaintiff's medical leave was the seizure of the company's cellphone in May 20, 2013 (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 112-16).  Plaintiff has not alleged that she lost her company cellphone due to her age, but she argues that she was the only senior management person required to turn in her company phone while she actually needed it for her job (Docket No. 44, Pl. Response ¶ 114).

This listing shows a series of discrete acts rather than a collective pattern creating age discrimination.  These post-March 2013 incidents involve Plaintiff complaining that she was treated different than younger employees whether the comparison made was apt.  While Plaintiff complained of Donohue's favoritism of younger employees, she does not claim recent incidents of that favoritism or its detriment to her.  Plaintiff no longer had management responsibilities, so she avoided repetition of the issues arising from supervision that occurred in 2012.  As for the confiscation of the company cellphone, while it was abrupt, Plaintiff has not established that she suffered this deprivation while

younger managers or employees who did not necessarily need the company equipment retained theirs.

Plaintiff has shown (even for the 300-day limitations period) that she was within the protected age group and was qualified for the position. Plaintiff, however, has not established that she experienced an adverse employment action. Instead, she showed during 2013 her complaints and comparison to younger employees of two companies and that he company cellphone was removed. Her job as a business analyst was different than a manager to make the pre-period incidents relevant and have her EEOC charge relate back to them. Furthermore, there is no inference of age discrimination arising from the situations cited by Plaintiff during the limitations period. These post-March 2013 events provide no basis for this Court to refer back to Plaintiff's treatment before then.

Thus, Defendant's motion for summary judgment against claims prior to March 1, 2013, is **granted**.

## 2. Other Elements of Age Discrimination Claim

For the age discrimination claim, Plaintiff states in her opposing papers but alludes to in her Complaint her age and the ages of other management employees she uses as comparisons (Docket No. 43, Pl. Aff. ¶¶ 13-14, Ex. A). The EEOC charge and the Complaint in this action refers to Defendant publicly acknowledging her 50th birthday (Docket No. 1, Compl. ¶ 27, Ex. 1, EEOC charge at 2). Defendant asserts that Plaintiff's 50th birthday was in July 2011 (Docket No. 31, Def. Rule 56.1 Statement ¶ 60; see Docket No. 44, Pl. Response to Def. Rule 56.1 Statement ¶ 60). Viewed in the light most favoring Plaintiff as opponent of summary judgment, she established the first element of a prima facie case that she was in the protected age group.

41

Plaintiff's problems arose from her relationship with Donohue and the allegations of her mistreatment of subordinates.   Plaintiff claims that Defendant's staff treated younger managers better than her.  The crux of Plaintiff's complaints are her comparisons of other employees and managers who had different duties, obligations, and pay from her.   Plaintiff attributes these differences to age discrimination, that Defendant was favoring younger employees in duties, discipline, and benefits from her.  As Patti Sue O'Malley noted, Plaintiff insisted upon comparing herself with other employees who were performing different jobs (Docket No. 31, Def. R. 56.1 Statement ¶¶ 97, 104, 105). Examining the other employees identified shows that they are not comparable to Plaintiff in duties, responsibilities or benefits for her to base her discrimination claim.

For example, Plaintiff points to Senft as having a similar position as Plaintiff's as business analyst (Docket No. 1, Compl. ¶ 14).   Senft, however, works for a different company, Capital Management Services (see Docket No. 44, Pl. Response ¶ 88). Plaintiff stated that she did not know what Senft did as an executive assistant with Capital Management Services but believed her duties were similar to Plaintiff's (id. ¶¶ 89-90). Plaintiff demanded from Defendant in discovery Senft's job description, but Defendant did not produce it (id. ¶ 90).   Although Defendant and Capital Management Services have common ownership and are sibling corporations, they remain separate corporations. There is no record of Plaintiff seeking discovery directly from Capital Management Services or subpoenaing it.  It is unclear why Defendant (the corporation and not its owners) would know of the job duties of an employee in a separate affiliate to respond to Plaintiff's discovery demand.  This is not comparable, despite the allegation that Donohue compared Plaintiff's salary with other managers (if an executive assistant in another firm

is deemed to be a "manager" for comparison).  Plaintiff herself declines comparing Senft's salary (see id. ¶¶ 90-94) but compared Senft's duties and responsibilities.

Plaintiff points to the reduced hours Jennifer Michael was allowed to perform while Plaintiff worked longer hours (some of which to complete Ms. Michael's work) (Docket No. 1, Compl. ¶ 17).  Defendant distinguish the two positions Plaintiff and Michael had, since Michael was director of marketing and was required to work outside of the office (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 99-102) and that Plaintiff's salary was higher than Michael's (id. ¶ 103).  Plaintiff points out that Michael was allowed to leave work early for personal or family reasons and she disputed the necessity for Michael to travel (Docket No. 44, Pl. Response ¶¶ 101, 102).  Plaintiff also states that she did not know Michael's salary and never sought to compare it with hers (id. ¶ 103).

Plaintiff next points to the lax treatment given to Mark Jones while Plaintiff was reprimanded for the same conduct (Docket No. 1, Compl. ¶¶ 22-23, 26, Ex. 1).  Mark Jones had "numerous complaints" in April 2013 without any consequences.  Plaintiff gives as an example that while both he and Plaintiff once were tardy, and Plaintiff was publicly reprimanded, but Jones was not.  (Id. ¶¶ 22, 23, Ex. 1; see Docket No. 31, Def. Rule 56.1 Statement ¶¶ 63-65.)  The mutual tardiness incident, however, occurred in June 2012 (Docket No. 31, Def. Rule 56.1 Statement ¶ 63), before the limitations period.  Plaintiff does not specify the "numerous complaints" against Mark Jones and whether his age resulted in no sanction (for example, that Donohue was made aware of Jones' misconduct and ignored it).  As O'Malley noted, Plaintiff identified two employees that received preferential treatment from Donohue (Mark Jones and Jennifer Michael), but Plaintiff

never suggested this treatment was due to age (Docket No. 36, O'Malley Aff. ¶¶ 21, 22-25).

Thus, considering each of the instances, it shows a pattern of different treatment, but some instances the difference is due to the comparatives were not equivalent, such as different job titles or even different employers.  It is not clear that the distinctions arise from Plaintiff being older or treated less favorably because of her age.  To establish a prima facie case, Plaintiff needs to show that these incidents give rise to an inference of age discrimination.

Plaintiff established that Defendant had an atmosphere of favoritism, primarily from Donohue, her immediate supervisor.  Plaintiff noted that Donohue favored some employees over others, socializing with the favored ones and allowing them to disregard standard operating procedures (Docket No. 43, Pl. Aff. ¶¶ 165-66).  All of Donohue's favorites (save one) were younger than 40 years old (id. ¶¶ 14, 167, Ex. A (list of employees with years of birth indicated)) but Plaintiff was not among the favored (id. ¶ 168).  Plaintiff contends that Donohue was more impatient with older employees (including Plaintiff) as well as an older woman at the client First Niagara Bank (Docket No. 48, Pl. Memo. at 15; Docket No. 43, Pl. Aff. ¶¶ 168-72, 101-04; Docket No. 41, Hibbard Aff. ¶¶ 7, 27).  But this favoritism cannot be inferred age discrimination.  Plaintiff only offers her conclusory allegations that this favoritism is based upon age, which is insufficient to withstand summary judgment, see Shandrew v. Quest Diagnostics Inc., 819 F. Supp.2d 181, 192 (W.D.N.Y. 2011) (Skretny, C.J.); Montimerano v. Wegmans Food Markets, Inc., No. 11CV6097, 2014 WL 1123402, at *4 (W.D.N.Y. Mar. 21, 2014) (Telesca, J.).

As Julie Fulcinti stated (Docket No. 34, Fulcinti Aff. ¶ 8), the issues Plaintiff complains about "amounted to nothing more than a personality conflict between her and Ms. Donohue."  Donohue had favorites and, given that the majority of the staff were young, Plaintiff not being in favor could be attributed to her age.  Favoritism without sign of age-based animus, however, is not actionable under the ADEA, see Village of Freeport v. Barrella, 814 F.3d 594, 613 (2d Cir. 2016).  Mere favoritism is not actionable unless, as the Southern District once noted, "that favoritism occurred because of some protected characteristic," Sattar v. Johnson, 129 F. Supp. 3d 123, 141 (S.D.N.Y. 2015).  "Federal antidiscrimination law does not forbid . . . . favoritism, nepotism, or cronyism, so long as it is not premised on animus against a protected class," Village of Freeport, supra, 814 F.3d at 613.

On the last element for her prima facie case, Plaintiff has not established an adverse employment action against her due to her age.  Plaintiff complains that she had worse working conditions (more responsibilities, more subordinates, longer hours, more intense scrutiny) than younger managers, that she was paid less or not offered raises given to younger employees.  As for pay, Defendant dispute that Plaintiff received less, pointing out that when hired she was the highest paid manager and Plaintiff also made comparisons to employees that are not comparable to her.

On Plaintiff's responsibilities, she was assigned to the First Niagara Bank conversion (with the increased subordinate staff) but there is no evidence this assignment was given to her because of her age.  While Defendant had the First Niagara Bank account, Plaintiff did not have other administrative functions.  This account led to the allegations of subordinate discontent and complaints.  The evidence of this is unclear and

led to two subsidiary motions decided above.  The record only contains human resources notes of complaints of those staffers, denials by Jones and other employees.  As noted above, the claims arising from Plaintiff's treatment during the First Niagara Bank conversion are time barred.

The incidents within the limitations period only led to her losing her company cellphone (despite alleging that younger managers not losing their company devices, see Docket No. 1, Compl. ¶ 32) and having her complaints disregarded, with threats of sanctions if she persisted in comparing other employees to her.  As discussed for Plaintiff's retaliation claim, another employee (whose age is undisclosed) had her company cellphone taken away the same time Plaintiff lost her phone.  Thus, even if Plaintiff alleged a prima facie case for age discrimination in the loss of the company cellphone, Defendant established a nondiscriminatory rationale (cost saving to avoid paying for cellular service that is not required for certain positions) and applied it beyond the alleged discriminatory manner.

Plaintiff's age has not led to her termination.  She was terminated in 2012 but was reinstated.  When the First Niagara Bank account left Defendant that year, Defendant no longer needed Plaintiff's position and reassigned Plaintiff to a newly created business analyst position created for her; this analyst position lacked supervisory responsibilities and did not reduce her salary.  Plaintiff was not terminated when she went on medical leave in May 2013.  Additionally, the business analyst position was not refilled when Plaintiff went on leave (Docket No. 35, Donohue Aff. ¶¶ 38-39; Docket No. 33, Def. Ex. E, O'Malley Tr. at 82; see Docket No. 31, Def. Rule 56.1 Statement ¶¶ 136, 137).

Therefore, Plaintiff's timely age discrimination claims do not establish an inference of age discrimination and questionably establish enduring an adverse employment action. Plaintiff failed to establish a prima facie case, the first step in the McDonnell Douglas evidentiary shifting.  Even if she produced sufficient evidence to establish a prima facie case of age discrimination (as Judge Telesca held in Lembaris v. University of Rochester, No. 12CV6214, 2013 WL 4587810, at *3 (W.D.N.Y. Aug. 28, 2013)), "Plaintiff has not produced evidence from which a reasonable jury could conclude, by a preponderance of evidence, that Plaintiff's age was the but-for cause for" the alleged adverse employment actions against her.  Thus, this Court need not shift the burden to Defendant to point to non-discriminatory reason for its treatment of Plaintiff, although Defendant has presented nondiscriminatory rationales (Docket No. 32, Def. Memo. at 20-22 (plaintiff did not get a pay raise for the new business analyst position because the position was under review)).

### 3.  Allegations of Disability Claim

Plaintiff withdrew her Third Cause of Action for disability discrimination (Docket No. 48, Pl. Memo. at 4).  Therefore, Defendant's motion for summary judgment dismissing that claim (Docket No. 30) is **granted**.

### 4.  Allegations of Hostile Work Environment

Applying this Court's standard in Mento, supra, 2012 WL 1908920, at *14, and Mack v. Otis Elevator, supra, 326 F.3d at 122, Donohue's favoritism permeated the work environment to alter Plaintiff's conditions of employment.  The difficulty (as discussed above) is tying this to Plaintiff's age to be discriminatory intimidation, see Brennan, supra, 192 F.3d at 318.  Defendant's conduct within 300 days of Plaintiff filing her EEOC charge fails to show age discrimination.  The events within that period (Plaintiff's complaints

47

about Donohue to the seizure of the company cellphone) do not indicate that they were due to Plaintiff's age or were comparative to younger employees' treatment.  Instead, Plaintiff tried to argue different benefits and duties of younger employees when she was paid more and had a distinct position in Defendant.  Plaintiff endured a hostile relationship with Donohue which Plaintiff surmises is due to her age, but Plaintiff fails to establish a prima facie case that she suffered a hostile work environment due to age.  Most of the age-based allegations are time barred.  Those events within the limitations period do not show a workplace permeated with discriminatory intimidation to state a hostile workplace; rather, these appear to be isolated instances that may not have involved Plaintiff's age, see, e.g., Campbell v. New York City Transit Auth., 662 F. App'x 57, 60 (2d Cir. 2016) (summary Order, two isolated incidents of harassment fails to allege hostile work environment); Palumbo v. Carefusion 2200, Inc., No. 12CV6282, 2014 WL 3921233, at *14 (W.D.N.Y. Aug. 11, 2014) (Wolford, J.) (alleged conduct did not rise to level of hostile work environment, where harassment alleged were deemed not severe or pervasive and few sporadic age-based comments over a span of several years).  Thus, Defendant's Motion for Summary Judgment (Docket No. 30) on this ground is **granted**.

  5.  Allegations of Retaliation

   Plaintiff alleges that Defendant retaliated against her when she complained of discrepancies in treatment due to her age (Docket No. 1, Compl. ¶¶ 28-32) and when she returned to work from medical leave by being offered a more stressful, less remunerative position (id. ¶ 40).  Plaintiff's medical leave claims are dismissed when Plaintiff agreed to drop her disability discrimination claim (cf. Docket No. 48, Pl. Memo. at 4).

As for retaliation due to her complaints, Plaintiff's claim is based upon her comparing salaries and claiming she did not receive a pay raise unlike younger employees in 2013 (Docket No. 1, Compl. ¶ 30), but she started at a high rate of pay and was paid more than the other managers (id.). Defendant created the new business analyst position after losing business from First Niagara Bank and kept Plaintiff on board (at her same pay) (Docket No. 31, Def. Rule 56.1 Statement ¶¶ 31-42; but cf. Docket No. 44, Pl. Response ¶¶ 31-42 (disputing details in some factual allegations in defense statement)). Plaintiff alleges that she was subject to retaliation after making complaints in March 2013 about Donohue's treatment of her (Docket No. 1, Compl. ¶¶ 28-29). Plaintiff was put on a final warning on May 14, 2013, to not compare her salary with others (id. ¶ 31). A week later, Plaintiff forcibly lost her company cellphone (id. ¶ 32).

Plaintiff did engage in protected activity here, arguing for a pay raise and asserting salary comparisons in making that claim. Defendant through its management knew that Plaintiff's argument during her annual review was protected; Donohue and O'Malley may have disagreed with Plaintiff asserting the comparable employees, but Defendant had to know Plaintiff had the right to argue grounds for a raise. The retaliation here is against Plaintiff repeating her arguments comparing her salary with other (younger) employees.

At issue, however, are whether Plaintiff in fact suffered an adverse employment action and a causal connection between her comparing employees to justify a raise and an adverse employment action. The only alleged possible adverse action were denial of a raise and the loss of a company cellphone. On the denied raise, the business analyst position was relatively new, and the deprivation of a raise was not due to retaliation for arguing for it or due to Plaintiff's age. As for the cellphone, there is no indication that it

was lost due Plaintiff's advocacy or her age. Plaintiff claims that younger managers retained company cellphones (whether necessary or not) while hers was taken (Docket No. 1, Compl. ¶ 32; see Docket No. 44, Pl. Response ¶ 112; Docket No. 43, Pl. Aff. ¶¶ 72-86). Jeffrey Hauser testified that Defendant's owners decided categorically to remove company cellphones from positions that did not require communication beyond work hours (Docket No. 33, Def. Ex. E, Hauser Dep. Tr. at 26-27). O'Malley testified that Chad Pyc, the chief operating officer of Defendant, instructed her to recover company cellphone from Plaintiff because it was no longer necessary for Plaintiff to have it and its recovery would be a cost saving to the company (Docket No. 33, Ex. E, O'Malley Dep. Tr. at 61-62). Other staff who were in support positions that were deemed not to need company cellphones also had their phones recovered (id. at 62-63); the age of these employees was not stated. O'Malley personally retrieved Plaintiff's phone as well as the phone of a member of the compliance team (id. at 63). Pyc asked O'Malley to recover Plaintiff's issued phone (id. at 63-64). Lane first tried to retrieve Plaintiff's issued phone; when Lane did not come back with that phone, O'Malley then went to retrieve it (id. at 64). O'Malley felt she could not wait for Plaintiff to remove personal data from the phone (personal items O'Malley said should not have been of a business phone) (id. at 64-65).

The above shows that Plaintiff was not singled out for having her cellphone removed (much less because of her age relative to other employees or in retaliation for opposing management in seeking a raise) or by having O'Malley do it. Plaintiff does not allege that chief operating officer Pyc (who ordered recovery of the devices) was operating under any age animus in taking her company cellphone or acted to retaliate against her. There is no evidence that Pyc was aware of Plaintiff's salary demands. Pyc

concluded that certain positions, including Plaintiff's, did not need a company cellphone and the phones were taken in a cost-saving measure.  The force used in recovery the cellphone (see Docket No. 44, Pl. Response ¶ 116) was probably unnecessary but it is not actionable.

Therefore, Defendant's Motion for Summary Judgment (Docket No. 30) dismissing Plaintiff's age discrimination retaliation claim in her First Cause of Action is **granted**.

6.  Defendant's Motion for Sanction for Alteration of Evidence (Docket No. 30)

Finally, Defendant moves for sanctions for Plaintiff's attempt to have her psychologist alter his treatment notes to add references to her complaints about Donohue's age-based treatment of Plaintiff, matters not reflected in that psychologist's session notes (Docket No. 32, Def. Memo. at 32-35).  This arises from two emails Plaintiff sent to Dr. Northman.  The first email, sent a day after Plaintiff's deposition, requested inclusion of these references and closing that the doctor not disclose this email in subsequent discovery and the second repeated the request to include her version of their sessions.  (Id. at 34.)  In the December 22, 2015, email Plaintiff noted to Dr. Northman a statement that needed correction from her May 30, 2013, session due to her "babbling" during that session (Docket No. 33, Def. Atty. Affirm. Ex. L).  After discussing her relocation and job history leading to her brother employing her at Defendant, Plaintiff stated that Donohue became "more and more aggressive after" her brother left Defendant (id.).  Plaintiff then said that Donohue was annoyed at her brother and "she was always mean to me during the beginning of my employment, and treated the younger people in the company more favorable [sic.] than me" (id.).  Near the end of that email, Plaintiff

asked that Dr. Northman keep it confidential and not send any changes to the lawyers and if asked in discovery later Plaintiff merely wanted "to clarify the details that may have sounded confusing while I was babbling" (id.).  The February 19, 2016, email Plaintiff explains why she came to Dr. Northman, that she sought his care due to the abuse at work and retaliation from her boss, claiming that her boss forced her to work excessive hours (id., Ex. M).  She then alleged that her boss "constantly belittled" her and not younger employees (id.).

Defendant argues that these emails also are troubling because it shows Plaintiff's attempt to alter treatment records and then conceal this attempt (Docket No. 32, Def, Memo. at 33, 34).  Plaintiff also failed to supplement her prior discovery responses to disclose these emails, emails that Defendant only learned during Dr. Northman's subsequent deposition (id. at 34).  Defendant thus demands as a sanction a negative inference as to Plaintiff's veracity as well as recovery of attorneys' fees and litigation costs incurred after Plaintiff's deposition (id. at 32, 35), citing this Court's inherent authority to control the parties' conduct before it to sanction Plaintiff here (id. at 34-35), Kalwasinski, supra, 2007 U.S. Dist. LEXIS 68736, at *4-5.

Plaintiff denies that she attempted to obstruct discovery; she and Dr. Northman interpreted the emails differently from the defense (Docket No. 48, Pl. Memo. at 25).  Dr. Northman, not considering the emails as instructing him to change the records, did not change the records and testified truthfully in accordance with his treatment notes (id.; see Docket No. 45, Ex. F, Dr. Northman's treatment notes; cf. Docket No. 33, Def. Atty. Affirm., Ex. G, Dr. Northman Dep. Tr.).

From review of these emails, it appears Plaintiff was attempting to clarify (in her mind) the record but not asking Dr. Northman to amend the treatment record. Plaintiff thought she was babbling, that Dr. Northman may not have recorded all that she said, and the first email was to fill the perceived gaps. There, she mentions both potential age discrimination (that Donohue treated her adversely as compared with younger employees) as well as personal animus (from Donohue's relations with Dan Abadir). Asking Dr. Northman not to disclose the first email to any of the lawyers and Plaintiff herself not producing these emails are disturbing. This, however, did not impede Dr. Northman's eventual testimony, reflecting his notes and recollection of sessions with Plaintiff rather than Plaintiff's version. For the summary judgment motion, this Court has a complete record of Dr. Northman and Plaintiff's versions of their sessions as to what she told him about her working environment.

Adopting a negative inference as to Plaintiff's veracity sought by Defendant at the dispositive motion stage, however, is an extreme remedy, see, e.g., Riley v. Marriott, supra, 2014 WL 4794657, at *7. The reason for Dr. Northman's testimony was to support Plaintiff's disability claim (that due to her stress she could not return to work in the collection position or work longer than 40 hours, see Docket No. 31, Def. Rule 56.1 Statement ¶¶ 117, 120, 127-30). That disability claim is now abandoned (Docket No. 48, Pl. Memo. at 4). The discrepancy between Dr. Northman and Plaintiff's recollections of their initial sessions on whether she discussed possible age discrimination suggests a possible issue of fact, but it is not material because it is cumulative of Plaintiff's other assertions of age discrimination. Therefore, this Court **declines to adopt a negative inference on Plaintiff from the handling of these emails**.

Plaintiff's withholding these emails and seeking her doctor to do the same requires some form of sanction.  Defendant was delayed by several months while Dr. Northman followed Plaintiff's injunction and did not produce these emails but revealed them in his deposition.  Defendant has not argued that it sought to depose Dr. Northman due to discrepancies in Plaintiff's production to justify imposing additional costs due to Plaintiff's handling of these emails.  It has not claimed that it was otherwise delayed in defending this case because it did not learn of (or have produced) these emails.  With dismissal of this action ordered in this Decision and Order, other sanctions (such as striking pleadings or staying proceedings) also are inappropriate.  Thus, Defendant's motion for sanctions (Docket No. 30) is **denied**.

D.  What Remains—Supplemental Jurisdiction

Given the disposition of the First and Third Causes of Action and Plaintiff's federal age discrimination claim alleged in the First, this Court **declines to exercise supplemental jurisdiction** over Plaintiff's parallel Second Cause of Action alleging New York State Human Rights Law age and disability claims, see 28 U.S.C. § 1367(c)(3) (District Court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it has original jurisdiction).

## IV.    CONCLUSION

With Plaintiff's withdrawal of her Americans with Disabilities Act claim, Defendant's Motion for Summary Judgment (Docket No. 30) is **granted in part**.  Her Motion for an adverse inference (Docket No. 52) is **denied or deemed moot given the statute of limitations for Plaintiff's underlying claims**, and Defendant's Motion to strike (Docket No. 56) Yolanda Jones' affidavit (Docket No. 40) is **denied because the failure to**

**disclose is harmless given the limitations period**.  As a result, Defendant's Summary Judgment Motion (Docket No. 30) against Plaintiff's remaining claims, that motion is **granted**.  This Court **declines to exercise supplemental jurisdiction** over Plaintiff's New York Human Rights Law Second Cause of Action.  Finally, Defendant's Motion for sanctions (id.) is **denied**.

## V.   ORDERS

IT IS HEREBY ORDERED, that Plaintiff's Motion for an Adverse Inference (Docket No. 52) is DENIED OR DEEMED MOOT,

FURTHER, Defendant's Motion (Docket No. 56) to Strike Yolanda Jones' Affidavit (Docket No. 40) is DENIED,

FURTHER, Defendant's Motion for Summary Judgment (Docket No. 30) is GRANTED,

FURTHER, as a result of the dismissal of the federal causes of action, this Court DECLINES to exercise supplemental jurisdiction over Plaintiff's Second Cause of Action under the New York State Human Rights Law,

FURTHER, Defendant's Motion sanctioning Plaintiff (Docket No. 30) is DENIED,

FURTHER, the Clerk of Court is directed to close this case.

SO ORDERED.


Dated:        August 4, 2020
              Buffalo, New York


                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge